UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 6:15-CR-5-GFVT-HAI-1 |
| | ) | |
| v. | ) | RECOMMENDED DISPOSITION |
| | ) | |
| ROBERT CLAY WIGGINTON, JR., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Before the Court is a motion to suppress evidence based on an alleged violation of Defendant's Fourth Amendment right against unreasonable searches and seizures, and his Fifth Amendment right against self-incrimination.  D.E. 28.  On December 17, 2014, the Community Trust Bank in London, Kentucky was robbed.  D.E. 50 at 36.  A subsequent investigation led to the arrest of Defendant in Atlanta, Georgia.  *Id.* at 43-44.  While in custody, Defendant gave several statements allegedly incriminating himself.

On May 29, 2015, Defendant, through counsel, filed a motion to suppress.  D.E. 28.  The United States filed a response on June 12, 2015 (D.E. 33), and the Court held an evidentiary hearing on July 14, 2015.  D.E. 39.  Defendant filed a supplemental brief on September 14, 2015 (D.E. 51), and the United States filed a supplemental response on September 28, 2015 (D.E. 52).  Defendant first seeks to suppress "all evidence discovered as a result of the government's unlawful searches [sic] electronic transmissions and records connected to his bank account and cell phone."  D.E. 51 at 37.  Defendant further seeks to suppress "all his statements to law enforcement both before and after he received Miranda warnings" on the basis of Defendant's alleged intoxication, and an alleged pre-*Miranda* interrogation.  D.E. 51 at 33-36.  For the

1

reasons that follow, the undersigned **RECOMMENDS** that Defendant's motion to suppress be **DENIED**.

## I.  FACTUAL BACKGROUND

On December 5, 2014, the Wright-Patt Credit Union in Englewood, Ohio was robbed. D.E. 50 at 8-9.  During the subsequent investigation, local law enforcement established that Defendant was a suspect in the robbery after publishing video surveillance of the robbery on local media and receiving two calls in response identifying Defendant as the person in the video. *Id.* at 10.  Englewood Police Department Detective Alan Meade testified that he contacted the Credit Union's bank fraud investigator, Renee Gildenburger, and learned that Defendant was a member at the Credit Union.  *Id.* at 10, 14.  Gildenburger told Meade that approximately two hours after the robbery, Defendant's card had been approved at a hotel five miles from the Credit Union, and that he had returned to the Credit Union a few days after the robbery and deposited approximately $2,500 in cash.  *Id.* at 14, 18.  Meade testified that he told Gildenburger that "[Defendant] is up to something" and to "[j]ust keep an eye on the account and let me know if you see anything unusual." *Id.* at 20.

Meade testified that, "several days later," Gildenburger contacted him and informed him that a transaction on Defendant's card had been approved at a Red Roof Inn in London, Kentucky.  *Id.* at 20.  Meade contacted local police in London to let them know that there was a robbery suspect in their area.  *Id.* at 22-23.  Subsequently, on December 17, 2014, the Community Trust Bank in London was robbed.  *Id.* at 36.  According to the police report, a white male wearing a black jacket and latex gloves brandished a handgun and demanded cash from the registers.  D.E. 52-2 at 4.  The police report indicates that several employees at the Red Roof Inn stated that Defendant checked out on the morning of the robbery and had requested to borrow

2

latex gloves from the cleaning staff.  *Id.* at 5.  Further, the police report indicates that Defendant was wearing clothing similar to that of the bank robber before checking out.  *Id.* at 6.  The police report further states that local law enforcement contacted Wright-Patt Credit Union and obtained a cell phone number associated with Defendant's account and learned that Defendant used his card in Charleston, Tennessee after the robbery.  *Id.* at 5.  Moreover, the report states that local law enforcement determined from AT&T that the number provided by Wright-Patt Credit Union was no longer active, but that there was a secondary number with AT&T for Defendant.  *Id.*

Law enforcement obtained a Kentucky state arrest warrant for Defendant.  *See* D.E. 52-3. FBI Special Agent Timothy James Burke testified that he is assigned to the law and crimes squad with the FBI in Atlanta, Georgia.  D.E. 50 at 40.  He testified that he learned from an FBI agent in London that there was a possible bank robbery fugitive in the Atlanta metro area.  *Id.* at 42. Burke testified that a "credit card charge" and "some teletechniques" using Defendant's cell phone were used to learn of Defendant's location in Atlanta.  *Id.* at 66.  The police report alleges that, at approximately 6:57 p.m. on December 17, "a cell phone registered to [Defendant] shows its location in Atlanta, Georgia near Atlanta Mariott [sic] Marquis" and that at approximately 6:58 p.m. "a charge of 148.48 shows to [Defendant's] card at Atlanta Marriott Marquis."  D.E. 52-2 at 6.

Burke testified that, after arriving at the hotel, law enforcement verified with hotel security that Defendant was staying there, and then proceeded to his room.  D.E. 50 at 43.  Burke stated that, at around 6:45 a.m., approximately nine law enforcement officers knocked and announced themselves and "approximately 30 seconds" later "[t]here was a verbal acknowledgement on [Defendant's] part that he was coming to unlock" the door.  *Id.* at 43-44. Within seconds of opening the door, Defendant "was arrested and put in handcuffs while a

search of the room and the immediate area" was conducted. *Id.* at 44-45. Defendant's arms were handcuffed and placed behind his back, and he was placed in a chair. *Id.* at 45, 97. There was an officer watching Defendant at all times. *Id.* at 45. Burke testified that, during the search of the room, law enforcement located "various pill bottles with pills in them" and a bottle of Patron tequila that was "more empty than full." *Id.* at 46, 48. However, Burke testified that he did not recall seeing any prescription bottle for Xanax. *Id.* at 70. Burke further stated that he did not remember finding an empty plastic sandwich bag in the search of Defendant's hotel room. *Id.* at 69. Burke testified that, after being taken into custody, Defendant was not "allowed to touch or mess with any of his property" and did not eat or drink anything. *Id.* at 47. Moreover, while in the room, Defendant indicated that he "went out" the night before. *Id.* at 47-48. Burke stated that there were no *Miranda* warnings given at the hotel, and were not given until 8:25 a.m. at the Atlanta Police Department headquarters. *Id.* at 75.

Burke testified that, while transporting Defendant to police headquarters, he gave "[Defendant] the courtesy of letting him know what he was charged with and that he would be turned over to Fulton County Jail at some point later that morning." *Id.* at 49. To this, Defendant responded that law enforcement "had him as far as the bank robbery…and he had information for [law enforcement] regarding narcotics and the Kentucky or specifically the London area here in Kentucky." *Id.* Burke testified that he told Defendant "[w]e'll have a chance to talk about that when we get to police headquarters" and did not pursue the inquiry any further. *Id.* at 49-50.

Defendant was advised of his rights as they appear on an Atlanta Police Department waiver of rights form. *Id.* at 51. Defendant signed the waiver form, and did not indicate that he did not understand the rights as explained to him or that he could not read the form. *Id.* at 53, 55;

*see* Government's Exhibit 1.  Burke testified that, during his interview of Defendant, Defendant did not seem intoxicated and he did not indicate to the officers that he had taken any drugs or alcohol that morning.  *Id.* at 56.  Moreover, Burke testified that Defendant was "engaging" and made no indication that he did not understand what was going on.  *Id.* at 56-57.

At the evidentiary hearing, the United States entered into evidence a video recording of Defendant's interview.  *See* Government's Exhibit 3.  The video corroborates the testimony of Burke.  At the beginning of the interview, Burke advised Defendant of his rights and Defendant signed a waiver form.  During the interview, Defendant is calm, speaks clearly, and is coherent.  His answers to law enforcement's questions are appropriate and he is able to accurately recite personal information.  He asks law enforcement detailed and insightful questions regarding his legal status and his ability to cooperate.  At no point in the video does Defendant indicate that he has consumed any illegal substances, or talk about being impaired in any way.  Defendant requests to be provided his "medicine" that was in his room but is referencing prescription medication.  The entire recorded interview lasted approximately an hour and ten minutes.

Burke testified that, after the video recording was completed, Defendant was transported to the Fulton County Sheriff's Office by the Atlanta Police Department but was allowed to make a monitored call to his ex-wife.  D.E. 50 at 64.  On this call, he did not mention anything to his ex-wife regarding drugs or alcohol.  *Id.* at 65.  Burke testified that he did not have any personal knowledge of any "triage" unit that examine any overdose inmates at the jail, that he was told Defendant was placed in the general population, and that other officers determined that there is no detox program at the jail.  *Id.* at 71-74.

Defendant testified that, on the morning of December 18, 2014, he was asleep when law enforcement knocked on his hotel room door.  *Id.* at 87.  He stated that, after telling law

enforcement that he was coming to the door, he "grabbed a bag with probably 15, 20 Xanaxes, tossed them all in my mouth, downed with some water that was on the side of my bed, put one sock on and hobbled to the door." *Id.* at 87-88.  He testified that the Xanax were in a sandwich bag.  *Id.* at 89.  He further stated that he had consumed most of a fifth of tequila the night before and went to bed at "3:00'ish." *Id.* at 88.

Defendant testified that he did not "remember any of the video" even though he admitted during the video he looked "coherent." *Id.* at 91.  He testified that he did not tell law enforcement about taking the Xanax because "there was no reason" to do so.  *Id.* at 95.  He stated that when he got to the Fulton County Jail, he was sent to the "medical unit" for "a whole week" and was given Ativan and Lithium.  *Id.* at 91.  He testified that, at the time of the arrest, he was taking Xanax regularly, but that taking 15 to 20 pills was not a normal dosage.  *Id.* at 91.  He stated that, in addition to the Xanax, he was taking his "normal Zanaflex" prescription, along with other prescriptions.  *Id.* at 89.

FBI Task Force Officer Buddy Blair testified that he had been in contact with an administrator at the Fulton County Jail in Atlanta.  *Id.* at 108.  According to Blair, he was informed by personnel at the jail that they did not have any detox unit, that Defendant was not taken to any other facility, and that there were no notes on his jail record indicating he had been placed in a medical unit.  *Id.* at 109.

## II.  DISCUSSION

### A.  Defendant's Claims Regarding his Banking Information

#### 1.  Defendant's Fourth Amendment Claim

Defendant's first argument for suppression is that law enforcement's actions in obtaining information from the Wright-Patt Credit Union about Defendant's account violated his Fourth

Amendment right against unreasonable searches and seizures.  D.E. 51 at 12.  According to

Defendant, he had a "legitimate expectation of privacy in such information" and law

enforcement acted without a "search warrant, subpoena, or other approval for [Defendant's]

account information, much less real-time updates about his debit card activity."  *Id.* at 15-16.

Because of this violation, Defendant requests that, among other evidence, all evidence acquired

from the Red Roof Inn and from his Atlanta hotel room, and any statements he made to law

enforcement, be suppressed.  *Id.* at 21-22.

The Fourth Amendment to United States Constitution protects the "right of the people to

be secure in their persons, houses, papers and effects, against unreasonable searches and

seizures."  U.S. Const. Amend. IV.  Application of the Fourth Amendment to searches focuses

on whether the defendant had a reasonable expectation of privacy in the place to be searched.

*See Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J. concurring).  A defendant

claiming that a search violated his Fourth Amendment rights has the initial "burden of

demonstrating that he had a legitimate expectation of privacy in the place that was searched."

*United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) (quoting *United States v.

Talley*, 275 F.3d 560, 563 (6th Cir. 2001)).  Once a defendant demonstrates an expectation of

privacy, the burden shifts to the United States to prove the validity of the search.  *United States

v. Murrie*, 534 F.2d 695, 698 (6th Cir. 1976).  The United States bears "the burden of proving the

legality of a warrantless search."  *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007).

Defendant did not have a reasonable expectation of privacy in the information disclosed

to law enforcement by the Wright-Patt Credit Union.  In *United States v. Miller*, 425 U.S. 435

(1976), a defendant moved to suppress copies of checks and other bank records obtained by

allegedly defective subpoenas.   The Court found that the Defendant had no legitimate

expectation of privacy in the contents of the records as they contained "only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id.* at 442. "The depositor takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government." *Id.* at 443; *see also United States v. Payner*, 447 U.S. 727, 732 (1980) ("[*Miller*] established that a depositor has no expectation of privacy and thus no 'protectable Fourth Amendment interest' in copies of checks and deposits slips retained by his bank."). The "Court consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743-44 (1979). Similarly, a defendant does not have an expectation of privacy in credit card statements. *See United States v. Phibbs*, 999 F.2d 1053, 1077-78 (6th Cir. 1993).

Here, the Wright-Patt Credit Union disclosed to law enforcement several pieces of information regarding Defendant's account. Law enforcement was informed that Defendant had deposited a large amount of cash in his account, that his card had been approved at a hotel near the site of the Ohio bank robbery on the day of that robbery, and that his card had been approved at the Red Roof Inn in London. D.E. 50 at 14, 18, 21. Moreover, the Credit Union informed law enforcement that, on the day of the Kentucky robbery, Defendant's card had been used in Tennessee and was later used at the Atlanta Marriott Marquis. D.E. 52-2 at 5. The Credit Union also disclosed to law enforcement an AT&T phone number associated with Defendant's account. *Id.*

All of this information was voluntarily conveyed by the Defendant to the credit union and was exposed to their employees in the ordinary course of business, therefore Defendant does not have a legitimate expectation of privacy in this information. *See Miller,* 425 U.S. at 442.

8

Defendant attempts to distinguish his case from *Miller* in two ways.  First, he argues that he has an expectation of privacy given the "near-universal use of debit and other electronic payment cards" and because "the type of electronic transmissions at issue in the present case provide real-time location data instantaneously and automatically[.]"   D.E. 51 at 14-15.   However, Defendant's attempt to avoid *Miller* fail because he has not established an objectively reasonable expectation of privacy.

To support this position, Defendant argues that, based on the Supreme Court's decision in *United States v. Jones*, 132 S. Ct. 945 (2012), the use of this type of information allows law enforcement to access "a precise, comprehensive records of a person's public movements, that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations."   D.E. 51 at 15 (quoting *Jones*, 132 S. Ct. at 955 (Sotomayor, J., concurring)).  Defendant is correct that, in her concurrence, Justice Sotomayor suggests that "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties."   *Jones*, 132 S. Ct. at 957 (Sotomayor, J., concurring) (*citing Smith v. Maryland*, 442 U.S. 735 (1979); *United States v. Miller*, 425 U.S. 435 (1976)).   However, *Jones* involved a physical trespass by law enforcement by installing a GPS on the defendant's vehicle, therefore a *Miller* issue was not before the court.   *See id.* ("[r]esolution of these difficult questions in this case is unnecessary, however, because the Government's physical intrusion on Jones' Jeep supplies a narrower basis for decision.").   Thus, the *Miller* third-party doctrine remains binding upon this Court.

Second, Defendant argues that the Credit Union's "account holder policy gave no notice that the bank could disclose information about customers indiscriminately and without legal process, much less real-time location data."   D.E. 51 at 15.   This argument implies that

Defendant was not aware that the Credit Union could disclose his information, and therefore he had an expectation of privacy. In the context of the Fourth Amendment, while the subjective expectation of privacy is part of the inquiry, Defendant must also demonstrate that the expectation is objectively reasonable. *See Katz*, 389 U.S. at 361. Based on the case law, Defendant has failed to establish that he had an objective expectation of privacy in this information. Thus, it is irrelevant whether Defendant had a subjective expectation of privacy.

## 2. Defendant's Claim under the Right to Financial Privacy Act

Defendant's second argument for suppression regarding his banking information is made under the Right to Financial Privacy Act, 12 U.S.C. §§ 3401-3422 (RFPA). Defendant states that the "RFPA protects the confidentiality of personal financial information by creating a statutory Fourth Amendment protection for bank records." D.E. 51 at 17. He argues that the RFPA requires that individuals be given notice before a bank discloses any personal information, and provides specific methods by which federal agents can obtain this information. *Id.* at 17-21. He concludes that because law enforcement "acquired [Defendant's] personal banking information in violation of federal law, all evidence derived from the use of such information must be suppressed." *Id.* at 21.

The RFPA generally prohibits financial institutions from producing records to governmental entities except pursuant to certain enumerated processes. *See* 12 U.S.C. § 3402 (authorizing disclosure with customer authorization, subpoena, search warrant, or formal written request). The RFPA allows for an award of damages against an "agency or department of the United States or financial institution" for a violation. 12 U.S.C. § 3417(a). It further provides for disciplinary action for willful or intentional violation by agents or employees of departments or agencies. 12 U.S.C. § 3417(b).

However, the RFPA provides that "[t]he remedies and sanctions described in this chapter shall be the only authorized judicial remedies and sanctions for violations of this chapter."  12 U.S.C. § 3417(d).  Therefore, federal courts hold that the remedies listed in 12 U.S.C. § 3417(a) are the exclusive remedies against the government for a violation of the RFPA, and thus it does not authorize a court to suppress or exclude evidence.  *See, e.g., United States v. Daccarett*, 6 F.3d 37, 52 (2d Cir. 1993) *superseded by statute on other grounds*, 18 U.S.C. § 983, *as recognized in United States v. Sum of $185,336.07 of United States Currency*, 731 F.3d 189 (2d Cir. 2013); *United States v. Davis*, 953 F.2d 1482, 1496 (10th Cir. 1992); *United States v. Kington*, 801 F.2d 733, 737 (5th Cir. 1986); *United States v. Frazin*, 780 F.2d 1461, 1466 (9th Cir. 1986).  Moreover, exclusion of evidence "is the proper remedy for some violations of the Fourth Amendment" but is "an appropriate sanction for a statutory violation only where the statute specifically provides for suppression as a remedy or the statutory violation implicates underlying constitutional rights[.]"  *United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006) (collecting cases).  The RFPA has no such specific authorization of suppression as a remedy, and, as described above, the claimed statutory violation did not implicate "underlying constitutional rights" because Defendant has failed to establish any reasonable expectation of privacy.

Although the record indicates that law enforcement did not pursue any of the required processes, it is unnecessary to determine if law enforcement violated the RFPA.  It is clear from the cited legal authority that suppression is not an available remedy under the RFPA.  Moreover, Defendant has not provided any legal precedent to establish that he is entitled to suppression on this basis.  This argument fails.

11

## B.  Defendant's Claims regarding his Cell Phone Information

### 1.  Defendant's Fourth Amendment Arguments

Defendant's next argument for suppression relates to law enforcement's acquisition and use of his phone's cell site location information (CSLI).  *See* D.E. 51 at 22-33.  Defendant requests that the "CSLI data itself and all evidence derived from its use must be suppressed" including "all evidence obtained during [Defendant's] arrest and the subsequent search of his hotel room[.]"  *Id.* at 31-32.  Further, he argues that "all statements made both before and after he received *Miranda* warnings must be suppressed for the reasons discussed previously."  *Id.* at 32.

Defendant first argues that "the government conducted an unlawful search under the Fourth Amendment when it obtained and inspected [Defendant's] CSLI without a warrant."  *Id.* at 24.  Citing Fourth Circuit case law, Defendant asserts that access to CSLI "can enable the government to trace the movements of the cell phone and its user across public and private spaces and thereby discover the private activities and personal habits of the user."  *Id.* (quoting *United States v. Graham*, 796 F.3d 332, 345 (4th Cir. 2015)).  According to Defendant, "cell phone users have an objectively reasonable expectation of privacy in this information, and inspection by the government requires a warrant."  *Id.* (citing *Graham*, 796 F.3d at 345).

To reiterate, a defendant claiming that a search violated his Fourth Amendment rights has the initial "burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched."  *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) (quoting *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001)).  Here, Defendant cannot establish that he had a reasonable expectation of privacy in the CSLI used by law enforcement.  The Sixth Circuit has held that a criminal defendant does not have a reasonable expectation of privacy in the data given off by his voluntarily procured cell phone.  *United States v. Skinner*, 690 F.3d 772,

777 (6th Cir. 2012).  In *Skinner*, law enforcement, during an investigation into a drug trafficking conspiracy, tracked Skinner's location using cell-site data for his cell phone. By continuously "pinging" Skinner's phone, law enforcement learned that Skinner was traveling from Arizona to Texas along Interstate 40.   *Id.* at 776.   After tracking Skinner using this method for approximately three days to a truck stop, law enforcement searched his motorhome and discovered 1,100 pounds of marijuana.  *Id.*  Skinner sought to suppress the search, asserting that the use of GPS location information from his cell phone was a warrantless search in violation of the Fourth Amendment. *Id.* at 777.

The court disagreed, reasoning that "'[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another.'"  *Id.* at 778 (quoting *United States v. Knotts*, 460 U.S. 276, 281 (1983)).  The court found "[t]here is no inherent constitutional difference between trailing a defendant and tracking him via such technology."  *Id.*  "Skinner was traveling on a public road before he stopped at a public rest stop.  While the cell site information aided the police in determining Skinner's location, that same information could have been obtained through visual surveillance." *Id.*  The court in *Skinner* further stated that, based on its holding in *United States v. Forest*, 355 F.3d 942 (6th Cir. 2004), individuals do not have a legitimate expectation of privacy in the cell site data itself. *Id.* at 779.

Here, the record is limited as to specifically what information law enforcement obtained and used.  Detective Meade testified he was told that Defendant was tracked via "phone pings." D.E. 50 at 30.  Special Agent Burke testified that "some teletechniques" using Defendant's cell phone were used to learn of Defendant's location in Atlanta.  *Id.* at 66.  The police report indicates that law enforcement contacted Wright-Patt Credit Union and obtained a cell phone

number associated with Defendant's account.  D.E. 52-2 at 5.  Moreover, the report alleges that local law enforcement determined from AT&T that the number provided by Wright-Patt Credit Union was no longer active but there was a secondary number with AT&T for Defendant.  *Id.* With this information, law enforcement discovered that a "cell phone registered to [Defendant] shows its location in Atlanta, Georgia near Atlanta Mariott [sic] Marquis." *Id.* at 6.  This information, coupled with a charge to Defendant's debit card, led officers to the hotel.  Once at the hotel, law enforcement verified with hotel security that Defendant was staying there, and proceeded to his room.  D.E. 50 at 43.  This is the extent of the evidence as to the use of CSLI.

On this factual record, there is nothing to establish that Defendant had an objective expectation of privacy in the location data used by law enforcement.  Law enforcement utilized CSLI that was apparently voluntarily provided by a third party, after another third party voluntarily disclosed Defendant's cell phone number.  The phone was traced to a public place—a hotel—in downtown Atlanta.  There is no allegation that law enforcement accessed the content of Defendant's communications, or monitored his data for an extended period of time.  Clearly, the information gathered from AT&T helped law enforcement. However, the same information could have been obtained through visual surveillance, and thus, it does not implicate the Fourth Amendment.  *See Skinner*, 690 F.3d at 778.

Defendant argues that the Court should recognize a reasonable expectation of privacy in his CSLI because an examination of this information "allows the government to place an individual and his personal property, specifically his cell phone, at the person's home or within other private locations at specific points in time."  D.E. 51 at 26.  According to Defendant, his eventual arrest at the hotel "demonstrates that law enforcement's review of CSLI necessarily provided them with information about his presence within a constitutionally protected area at a

14

particular time." *Id.*  He attempts to distinguish his case from *Skinner* on this ground, stating that the data revealed his "location while he was within a constitutionally protected area, his hotel room." *Id.* at 31.

It is true that a hotel room may be entitled to Fourth Amendment protection.  *See United States v. Lanier*, 636 F.3d 228, 232 (6th Cir. 2011).  However, Defendant provides no binding authority to support the assertion that CSLI used to track someone's general location to a constitutionally protected area invokes Fourth Amendment protection.  More importantly, Defendant's assertion that the CSLI was used to track him into his hotel room is not supported by the record.  Special Agent Burke testified that in order to locate Defendant's hotel room, they contacted hotel security and learned that he was a guest at the hotel.  D.E. 50 at 43.  Moreover, the police report states that the data was used to place Defendant "near" the hotel, not a specific room within the hotel.  D.E. 52-2 at 6.  Such location could have just as easily been obtained by visual surveillance.

Defendant also argues that continuous monitoring of an individual and his property over an extended period of time would constitute a search.  Again citing the concurrences in *Jones*, Defendant asserts that "five Justices confronted the *Katz* question and agreed that 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy." D.E. 51 at 28 (*quoting United States v. Jones*, 132 S. Ct. 945, 955 (Sotomayor, J., concurring) (citing *Jones*, 132 S. Ct. at 964 (Alito, J., concurring)).  According to Defendant, these concerns over long-term GPS monitoring apply equally to CSLI.  *Id.* (citing *United States v. Graham*, 796 F.3d 332 (4th Cir. 2015)).

In addition to not forming the basis for the decision in *Jones*, the type of long-term monitoring concerns addressed by the *Jones* concurrences are not present in this case.  The

15

Kentucky bank robbery occurred on December 17, 2014, and Defendant was arrested in the early morning hours of December 18, 2014. *Jones* involved GPS monitoring over a 28-day period, while here the tracking, at most, was for a period of less than twenty four hours. "Relatively short-term monitoring of a person's movements on public streets accords with expectations of privacy that our society has recognized as reasonable." *Jones*, 132 S. Ct. at 964 (Alito, J., concurring) (citing *United States v. Knotts*, 460 U.S. 276, 281-82 (1983)). Further, the court in *Skinner* addressed *Jones* and found that its concerns were inapplicable to Skinner's case, as the monitoring there lasted for approximately three days. *See Skinner*, 690 F.3d at 780-781.

Finally, Defendant cites persuasive authority holding that there is a reasonable expectation of privacy in CSLI. *See* D.E. 51 at 29. However, none of his cited authority is binding upon this Court. *Skinner*, based on the factual record here, controls. Therefore, the Court finds that Defendant did not have a reasonable expectation of privacy in the CSLI data obtained and used by law enforcement.

### 2. Defendant's Arguments under the Stored Communications Act

Defendant's second argument in support of suppression related to the CSLI is that, in obtaining the CSLI, law enforcement violated the Stored Communications Act (SCA), 18 U.S.C. §§ 2701-2712. D.E. 51 at 22. According to Defendant, the "SCA generally prohibits providers of electronic communication services or remote computing services from disclosing information to the government" without some court order, subpoena, or search warrant. *Id.* at 22-23. Defendant asserts that "[i]n the present case, the record establishes that the government neither requested permission from an impartial magistrate nor made a showing of probable cause to access [Defendant's] CSLI." *Id.* at 23.

The SCA provides civil damages and criminal penalties for violations of its provisions. *See* 18 U.S.C. §§ 2701(b), 2703. Moreover, the SCA provides that "[the] remedies and sanctions described in this chapter are the only judicial remedies and sanctions for nonconstitutional violations of this chapter." 18 U.S.C. § 2708. Suppression is not one of those remedies. "[I]t is well settled that there is no suppression remedy for violation of the SCA." *United States v. Hardrick*, 2012 WL 4883666, n.44 (E.D. La. October 15, 2012) (collecting cases).

From the record, it does not appear that law enforcement obtained an order to access Defendant's CSLI. However, such a violation of the SCA (even if it occurred) does not require suppression, and the disclosure of the CSLI did not violate any reasonable expectation of privacy. Therefore any violation of the SCA did not implicate any constitutional right, and suppression is not warranted.

## C. Voluntariness of Defendant's Confession

Defendant next argues that his confession was involuntary because he was intoxicated at the time of the interview. D.E. 51 at 33-34. Defendant asserts that law enforcement "should have known that [Defendant] might have been under the influence at the time of his arrest and subsequent interview." *Id.* at 34. According to Defendant, officers discovered various pill bottles containing medications and a nearly empty tequila bottle, and were informed that Defendant "went out" the night before. *Id.* Further, he states that, because he "was sufficiently intoxicated such that his 'capacity for self-determination [was] critically impaired,' all his statements to law enforcement both before and after he received Miranda warnings must be suppressed." *Id.* (quoting *United States v. Dennis*, 701 F.2d 595, 598 (6th Cir. 1983)).

"When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary."

*United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999) (citing *United States v. Wrice*, 954 F.2d 406,410 (6th Cir. 1992)).  Due Process "prohibits the admission of coerced confessions procured by means 'so offensive to a civilized system of justice that they must be condemned." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994) (citing *Miller v. Fenton*, 474 U.S. 104, 109 (1985)).

The Sixth Circuit has established three requirements to prove that a confession was involuntary: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in defendant's decision to offer the statement." *Mahan*, 190 F.3d at 422 (citing *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988)).  Therefore, some form of police coercion is necessary to find a confession involuntary.  *See United States v. Weir,* 587 F. App'x 300, 304 (6th Cir. 2014) (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)).  "When a suspect suffers from some mental incapacity, such as intoxication or retardation, and the incapacity is known to interrogating officers, a 'lesser quantum of coercion' is necessary to call a confession into question." *Hill v. Anderson*, 300 F.3d 679, 682 (6th Cir. 2002) (quoting *United States v. Sablotny*, 21 F.3d 747, 751 (7th Cir. 1994)).

Defendant alleges that law enforcement "should have known" that he was intoxicated at the time of his confession resulting in coercive conduct.  At the evidentiary hearing, Special Agent Burke testified that Defendant seemed "coherent, clear" and Defendant conceded that "I look at the video and I look coherent[.]"  D.E. 50 at 53, 91.  Further, the Court has reviewed the video of the interview and the objective circumstances support those descriptions.  Throughout the interview Defendant remained upright, coherent, and demonstrated no other physical manifestations of intoxication.  His speech was not slurred, and he engaged in meaningful

18

conversation with the officers.  His answers to law enforcement's questions were appropriate, and were focused on the task at hand.  Moreover, his discussions with the officers indicates he was fully aware of the seriousness of the situation at hand and had detailed knowledge of the criminal justice system.

Defendant argues that officers observed, in Defendant's hotel room, a nearly empty liquor bottle, various pill bottles containing medications, and were informed that Defendant "went out" the night before.  D.E. 51 at 34.  However, these observations alone are not enough to find that law enforcement knew, or should have known, of any intoxication at the time of interview.   The medication that was found was prescription medication and there was no testimony that the bottles were empty or indicated any kind of improper usage.   Moreover, nothing in the record indicates that Defendant had been drinking before officers entered his hotel room as Defendant was asleep when law enforcement came to his door.  Finally, to the extent Defendant alleges that he consumed vast quantities of Xanax before officers entered his room, the Court needs not make a finding as to that claim because there were no objective circumstances that should have made officers aware he had done so.  Agent Burke testified that he did not recover any sandwich bag that allegedly contained the Xanax, and the FBI's evidence log contains no record of such a bag.  *See* D.E. 52-5.  Moreover, at no time did Defendant inform officers of his alleged intoxication.

Based on this record, there were no circumstances from which law enforcement did know, or should have known, of Defendant's alleged intoxication.  As such, there is no evidence of any form of coercion on behalf of law enforcement.  Therefore, Defendant's confession was voluntary within the meaning of the Due Process clause.

**D.  Defendant's *Miranda* Claims**

   **1.  Custodial Interrogation before *Miranda* Warnings were Given**

   Defendant next argues that he was subjected to custodial interrogation without being given proper *Miranda* warnings in violation of his Fifth Amendment rights.   According to Defendant, he was subjected to interrogation while being driven by law enforcement to the Fulton County Detention Center.[1]   D.E. 51 at 35.   Defendant argues that Agent Burke's statements elicited an incriminating response from Defendant and, at the time, Defendant had not been Mirandized.  *Id.*

   "Where a party seeks suppression of his statements based upon a failure to receive his *Miranda* warnings, he must demonstrate by a preponderance of the evidence that he was entitled to receive them; *i.e.*, that he was subjected to a 'custodial interrogation.'"   *United States v. Lawrence*, Nos. 88-2056, 88-2086, 88-2087, 88-2109, 88-2135, 1989 WL 153161, *5 (6th Cir. Dec. 18, 1989).  Under the Fifth Amendment to the United States Constitution, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const., amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court set forth certain procedural safeguards to secure this right.  Accordingly, prior to interrogating an individual in custody, law enforcement must warn that individual:

>    that [s]he has a right to remain silent, that any statement [s]he does make may be used as evidence against [her], and that [s]he has a right to the presence of an attorney, either retained or appointed.

*Miranda,* 384 U.S. at 444.   Absent this warning, any statements "stemming from custodial interrogation of [a] defendant" are not admissible in a subsequent trial.  *Id.*

---

[1] The Court construes Defendant's argument as relating to the drive from the hotel to the Atlanta Police Department headquarters because, there is no evidence of what occurred while being transported to the Fulton County Jail. Instead, Defendant was initially taken from the hotel to Atlanta Police Department headquarters.  D.E. 50 at 75.

A custodial interrogation occurs when "questioning [is] initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* The parties do not dispute that Defendant was in custody at the time the alleged statements were made by Special Agent Burke. Moreover, *Miranda* warnings were not given until 8:25 a.m., and no warnings were given at the hotel. Therefore, the relevant inquiry is whether Defendant was subjected to interrogation before warnings were given.

Interrogation "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Therefore, the question is whether law enforcement should have known their words or actions were reasonably likely to elicit an incriminating response. However, law enforcement "cannot be held accountable for the unforeseeable results of their words or actions[.]" *Id.* at 302. "The unexpected and unresponsive reply cannot retroactively turn a non-interrogation inquiry into an interrogation." *United States v. Woods*, 711 F.3d 737, 741 (6th Cir. 2013) (citing *Innis*, 446 U.S. at 301-302)).

Here, Defendant has not met his burden to establish that he was subjected to custodial interrogation in violation of *Miranda*. The testimony from Agent Burke regarding the challenged statements was:

> Generally what I do when I just arrested someone is I tell them, basically I give them the courtesy of what their day is going to look like, you know, where they are going to go as far as what jail, if there is going to be a hearing; normally that's for federal arrestees, but in this case, you know, it was a state warrant.
> So, you know, I gave him the courtesy of letting him know what he was charged with and that he would be turned over to Fulton County Jail at some point later that morning.
> And he—you know, he indicated that we had him as far as the bank robbery, when I brought up it was armed bank robbery charges out of Kentucky

that we had him, and he had information for us regarding narcotics and the Kentucky or specifically the London area here in Kentucky.

...I said, "We'll have a chance to talk about that when we get to the police headquarters."

D.E. 50 at 49.  On cross-examination, Burke further described the exchange: "[y]ou know, I start chronologically, and the first thing is when we get to the APD booking room to interview, so I made it clear the interview would happen and it would not happen in the car."  *Id.* at 78.  Burke further stated that, after Defendant made the statement in the car, he waited until the time of the interview to follow up on it.  *Id.*

This testimony does not establish that Burke should have known that his description of the process of Defendant's upcoming day would elicit an incriminating response.  From Burke's testimony it is clear that he told Defendant that the interview would happen at APD and not happen in the car.  *Id.* at 78.  Moreover, simply by describing what Defendant was charged with, Burke could not have anticipated that Defendant would respond with an incriminating response.  Defendant's response to Burke's description was not the result of the functional equivalent of express questioning, but was in response to a description "to which no response...was invited."  *Innis*, 446 U.S. at 301.  Burke stopped Defendant and informed him that they would conduct the interview once they arrived at the headquarters.

By describing the procedures for processing Defendant, Burke's actions did not rise to the level of interrogation.  Therefore, this argument for suppression fails.

### 2. Validity of Defendant's *Miranda* Waiver

To the extent Defendant argues that his *Miranda* waiver was involuntary, the Court finds this claim to be meritless.  In order for a waiver of *Miranda* rights to be valid, the waiver must be voluntary, knowingly, and intelligently made.  The Supreme Court has set out a test to determine the validity of a defendant's waiver of his *Miranda* rights:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Again, a suspect's intoxication does not make a confession involuntary without some form of police coercion.  *See United States v. Newman*, 889 F.2d 88, 95 (6th Cir. 1989).  For the reasons set forth above in the Court's Due Process analysis, the waiver was voluntary because the officers did not know, or have any reason to know, of Defendant's alleged intoxication.

*Miranda* waivers must also be knowing and intelligently made.  *See Colorado v. Spring*, 479 U.S. 564, 574 (1987).  "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Firth Amendment privilege."  *Id.*  "A waiver is knowing and intelligent if the totality of the circumstances show that Defendant understood his rights and the consequences of waiving those rights."  *United States v. Mullikin*, 534 F. Supp. 2d 734, 744 (E.D. Ky. 2006) (citing *Clark v. Mitchell,* 425 F.3d 270, 284 (6th Cir. 2005)).

Defendant's decision to waive his rights was knowing and intelligent.  Agent Burke read aloud the "Atlanta Police Department Waiver of Counsel by Defendant in Custody" form to Defendant before beginning the interview on December 18, 2015.  Defendant then signed the form, acknowledging that he wished to waive his rights.  *See* D.E. 52-6.  Defendant neither expressed any confusion about his rights, nor asked any questions about the form.  There is no indication throughout the interview that Defendant did not understand his rights.  Based on this, the Court concludes that Defendant's waiver was knowingly and intelligently made.

Accordingly, the Court finds that Defendant's waiver of his *Miranda* rights was voluntarily, knowingly, and intelligently made.

### III.  CONCLUSION

Based upon the foregoing, the undersigned **RECOMMENDS** that Defendant's motion to suppress (D.E. 28) be **DENIED.**

The Court directs the parties to 28 U.S.C. § 636(b)(1) for appeal rights concerning this recommendation, issued under subsection (B) of that statute.  Pursuant to § 636(b)(1) and Federal Rule of Criminal Procedure 59(b), any party may serve and file written objections to any or all portions for de novo consideration by the District Court.  The parties should consult the aforementioned statute and rule for specific appeal rights and mechanics.  Failure to object in accordance with Rule 59(b) waives a party's right to review.

This the 28th day of October, 2015.

Signed By:

*Hanly A. Ingram*

United States Magistrate Judge